**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MUHAMMAD LEACH,

      Plaintiff,

    v.

KATHLEEN BISCOE, *et al.*,

      Defendants.

No. 4:20-CV-01429

(Chief Judge Brann)

**MEMORANDUM OPINION**

**FEBRUARY 14, 2022**

Plaintiff Muhammad Leach is currently incarcerated at the State

Correctional Institution in Coal Township, Pennsylvania (SCI Coal Township). In

August 2020, he filed this *pro se* Section 1983[1] action, asserting constitutional tort

claims under the First and Fourteenth Amendments to the United States

Constitution against various prison officials. Presently pending is Defendants'

motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.[2]

For following reasons, the Court will grant Defendants' Rule 56 motion.

---

[1]  42 U.S.C. § 1983. Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

[2]  Doc. 25.

## I.   **FACTUAL BACKGROUND**[3]

Leach was transferred to SCI Coal Township in June 2019.[4]  Shortly after his transfer, Leach obtained employment in the prison's Dietary Department, working from 5:00 a.m. to 1:00 p.m. daily.[5]  Leach avers that he is a devout, practicing Muslim, which requires him to pray five times a day at fixed intervals, at least one of which occurs during his Dietary work hours.[6]

According to Leach, on September 24, 2019, he was praying at his job site when defendant Jacob Davis—a correctional Food Service Instructor—approached him and told him he was not allowed to pray on the worksite.[7]  Leach attests that Davis expressed awareness of the prayer requirements of the Islamic faith, but still told Leach he was not permitted to pray while on the job.[8]

That same day, Leach filed a Form DC-135A staff-member request to Janet Bartholomew, Corrections Employment and Vocational Coordinator at SCI Coal

---

[3]   Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  *Id.*  Unless otherwise noted, the following factual background derives from the parties' Rule 56.1 statements of material facts.  *See* Docs. 28, 31.  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the Court cites directly to the Rule 56.1 statements.

[4]   Doc. 28 ¶ 1; Doc. 31 ¶ 1.

[5]   *See* Doc. 28 ¶ 8; Doc. 32-2 ¶¶ 1-2.

[6]   *See* Doc. 32-2 ¶¶ 1-3.

[7]   *Id.* ¶ 1; Doc. 1 ¶ 11; Doc. 20 ¶ 11.

[8]   Doc. 32-2 ¶ 4.

Township.[9]  In his request, Leach asked to be "switched to maintenance and out of

the kitchen as soon as possible" in order to "avoid any problems or being written

up."[10]  Two days later, Bartholomew responded to Leach and asked him to

complete and return an Inmate Employment Survey, which Leach returned on

September 30.[11]  The next day, Bartholomew responded that Leach would be

"placed on the list for Maintenance Repair," but that he should select two other

employment choices because he was ineligible for the "Carpentry" and "Paint

Shop" selections he had made due to those jobs' locations and Leach's sentence.[12]

Leach filed grievance number 829861 on October 14, 2019, in which he

complained about being denied the ability to pray while working at his Dietary

job.[13]  In the grievance, he noted that he is a "sincere, devoted Muslim," is required

to pray five times per day, would only need "five minutes" to pray, and could

exercise his religious practices without interrupting or interfering with the Dietary

Department's services.[14]  As relief, Leach sought monetary compensation "and/or

transfer to SCI-Phoenix."[15]  Leach did not name any specific prison officials in this

grievance, but did reference that the request-to-pray denials came from "Dietary

---

[9]  Doc. 27-10 at 7; Doc. 27-11 ¶ 1; Doc. 28 ¶ 31; Doc. 31 ¶ 31.
[10]  Doc. 27-10 at 7; Doc. 28 ¶ 31; Doc. 31 ¶ 31.
[11]  Doc. 27-10 at 6-7; Doc. 28 ¶¶ 32-33.
[12]  Doc. 27-10 at 6; Doc. 27-11 ¶ 9; Doc. 28 ¶¶ 34-35; Doc. 31 ¶¶ 33-34.
[13]  Doc. 27-1 at 10; Doc. 28 ¶ 9.
[14]  Doc. 27-1 at 10.
[15]  *Id.*

Supervisors."[16]  In his first-level appeal, Leach asserted that he filed this grievance against defendant Robert Kelley, a correctional Food Service Manager,[17] although Kelley is not named in the grievance itself.

Leach avers that defendant Neil Inch-Diorio—another Food Service Instructor at SCI Coal Township—informed him that, because he had filed a grievance against Dietary staff and the grievance was still being litigated, Leach would be temporarily removed from his Dietary work assignment.[18]  Leach attests that he spoke with Kelley in the supervisor's office, with Inch-Diorio present, and informed Kelley that he feared Inch-Diorio and other Dietary staff would retaliate against him for filing grievance 829861.[19]  According to Leach, Kelley told him that he would speak with Inch-Diorio, Davis, and other Dietary staff about Leach's concerns, but also ordered Leach not to return to work until the issues raised in the grievance were resolved.[20]

On November 5, 2019, three weeks after Leach filed his grievance, defendant Diane Daya—another correctional Food Service Instructor—filed a "Form DC-141 Part 1" disciplinary action against Leach for "refusing to work"

---

[16]   *Id.*
[17]   *See* Doc. 1 ¶ 10; Doc. 27-1 at 4.
[18]   Doc. 32-2 ¶ 6.
[19]   *Id.* ¶ 7.
[20]   *Id.* ¶¶ 8-9.

that day.[21]  Leach avers that Daya told him that "since [he] like[s] to file grievances, [he] ha[s] to take the misconduct report up with" defendant Kathleen Biscoe, Leach's Unit Manager.[22]  Leach further alleges that the charges in this disciplinary filing were "falsified" and made in retaliation for the grievance he submitted.[23]  The reviewing ranking correctional officer referred the informal resolution to Biscoe.[24]

On November 8, 2019, Biscoe held an informal resolution meeting with Leach.[25]  Leach attests that he explained to Biscoe that he had never refused to work, but rather that Kelley had ordered him not to return to work until the pending grievance was resolved.[26]  Upon Leach's insistence, Biscoe contacted Kelley and confirmed that Leach had been ordered not to return to work.[27]  Leach asserts that he asked Biscoe to dismiss the disciplinary report and that he be

---

[21]  Doc. 32-3 at 1; Doc. 28 ¶ 17.  Although Leach describes this disciplinary filing as a DC-141 Part 1 "Misconduct Report," *see* Doc. 32-2 ¶ 10, the document itself shows that the box for "DC-ADM 801 Informal Resolution" is checked, not the box for "Misconduct Report," s*ee* Doc. 32-3 at 1.  According to Pennsylvania Department of Corrections' policy, the issuing staff member (here, Daya) may recommend informal resolution for eligible charges, but the ultimate determination on whether a rule-violation charge is referred for informal resolution is made by the "Shift Commander."  *See* COMMONWEALTH OF PA., DEP'T OF CORR., INMATE DISCIPLINE, Policy No. DC-ADM 801 § 2(A)(2) (Nov. 24, 2016) (hereinafter "DC-ADM 801").  From the face of the form, it appears that Daya recommended informal resolution and the Shift Commander agreed.  *See* Doc. 32-3 at 1.

[22]  Doc. 32-2 ¶ 11.

[23]  Doc. 1 ¶ 23; Doc. 31 ¶ 16.

[24]  *See* Doc. 32-3 at 1.

[25]  *See* Doc. 28 ¶¶ 22, 27; Doc 31 ¶ 27; Doc. 32-2 ¶ 12.

[26]  Doc. 32-2 ¶ 14.

[27]  *Id.* ¶¶ 15-16.

"exonerated" of the charge therein.[28]  On the "Informal Resolution Action Form,"
Biscoe marked that "No Action" would be taken.[29]  According to Zachary Moslak,
Chief Hearing Examiner for the Pennsylvania Department of Corrections (DOC),
"'No Action' in essence means not guilty."[30]

Leach continued to pursue grievance 829861 through the DOC's levels of
review.  After Kelley rejected the grievance on initial review, Leach appealed to
the Facility Manager.[31]  In this December 3, 2019 appeal, Leach maintained that
the grievance was "filed against dietary Supervisor Mr. R. Kelley," and indicated
that, since September 24, Kelley had been refusing to allow Leach to work.[32]  He
also complained that a false misconduct had been filed against him for refusing to
report to his job, even though Kelley had ordered him to remain off work.[33]  The
Facility Manager denied Leach's appeal on December 9, noting that he would not
address the allegedly false misconduct because that issue was not raised "at the
initial level."[34]

Leach appealed the Facility Manager's denial to the Secretary's Office of
Inmate Grievances and Appeals (SOIGA), the highest level of review.[35]  In the

---

[28]   Doc. 32-2 ¶ 17.
[29]   Doc. 32-3 at 2.  It appears that Leach refused to sign this form.  *See id.*
[30]   Doc. 27-5 ¶ 12 (July 21, 2021 Decl. of Zachary Moslak).
[31]   *See* Doc. 27-1 at 4-7; Doc. 28 ¶¶ 12-13.
[32]   Doc. 27-1 at 4.
[33]   *Id.*
[34]   *Id.* at 2-3.
[35]   *Id.* at 1.

SOIGA's January 9, 2020 denial, the Chief Grievance Officer noted that her investigation determined that, at the time of SCI Coal Township's refusal to permit Leach to pray on the job, "staff were following the direction that was in place at that time."[36] However, the Chief Grievance Officer further noted that new guidance had recently been provided to SCI Coal Township officials "to permit inmates to pray" and that Leach should submit a "Religious Accommodation Request" to the appropriate official regarding his request to pray during work hours.[37]

Neither Leach's complaint nor his declarations provide details as to what transpired in the month following the SOIGA's denial of grievance 829861.  For example, Leach does not explain whether he was permitted to return to work, or whether he sought the religious accommodation suggested by the SOIGA.  The next pertinent event in the record shows that, on February 11, 2020, Bartholomew emailed Lieutenant Christopher Belles, asking that he approve Leach's assignment to Maintenance in the electrical division.[38] Bartholomew avers that the delay until February 11 in the reassignment was due to a "long waitlist" for Maintenance.[39] Belles approved the assignment the same day, and Leach began work in Maintenance on February 14, 2020, at the same rate of pay—$0.42 per hour—he

---

[36]   *Id.*
[37]   *Id.*
[38]   Doc. 27-10 at 5.
[39]   Doc. 27-11 ¶ 11.

had been receiving in Dietary.[40]  Leach attests that, while he earns the same hourly

rate in Electrical Maintenance, he is only permitted to work 7 hours a day, as

opposed to 8 hours a day when he worked in Dietary.[41]

Leach filed grievance number 854220 on February 27, 2020.[42]  In it, he

claimed that Kelley, Daya, Inch-Diorio, and Davis retaliated against him for

asserting his religious rights by "removing him from his dietary work assignment,"

and sought compensatory and punitive damages as well as transfer to another

prison.[43]  Leach does not mention the November 2019 DC-141 disciplinary report

in this grievance.[44]

In the March 16, 2020 Initial Review Response, the grievance officer noted

that he had spoken extensively with Kelley, who had explained that Leach had

been repeatedly instructed on the religious accommodation process.[45]  Kelley had

further recounted to the grievance officer that Leach—"at the advisement of [his]

attorney"—had requested a change in work assignment until his "civil case" was

resolved, and that request is why Leach was switched from Dietary to

Maintenance.[46]  The grievance officer further explained that, after speaking with

---

40   Doc. 27-10 at 5; Doc. 27-11 ¶ 12; Doc. 31 ¶ 37.
41   Doc. 32-2 ¶ 20.
42   Doc. 32-6 at 10.
43   *Id.*
44   *Id.*
45   *Id.* at 8.
46   *Id.* at 8-9.

various DOC religious services officials, "[t]he direction for all denominations who wish to pray[] during their work hours is that a Religious Accommodation Request . . . needs to be submitted and reviewed at the local level."[47]  The officer then set out the full religious accommodation review process, noting that Leach had not yet started that process by submitting his accommodation request.[48]  The grievance officer consequently denied grievance 854220.[49]

Leach appealed to the Facility Manager, who affirmed the denial.[50]  In particular, the Facility Manager emphasized that Leach was reassigned to Maintenance at his own request and not due to retaliation.[51]  The Facility Manager did confirm that Leach's hours of employment had been reduced from 8 to 7 hours per day, but explained that this reduction was "due to the scope of [Leach's] new position."[52]  Leach appealed to the SOIGA, and on April 21, 2020, the Chief Grievance Officer affirmed the grievance denial.[53]

Leach filed suit in August 2020, alleging First Amendment retaliation as well as a violation of his procedural due process rights.[54]  Defendants first sought

---

[47]  *Id.* at 8.
[48]  Doc. 32-6 at 8.
[49]  *Id.*
[50]  *Id.* at 4-7.
[51]  *Id.* at 4.
[52]  *Id.*
[53]  *Id.* at 1-3.
[54]  Doc. 1 ¶¶ 1, 36-40; *see also* Doc. 32 at 1.  Leach erroneously identifies the "Due Process Clause" as being part of the First Amendment (rather than the Fifth or Fourteenth Amendment). *See* Doc. 1 ¶¶ 1, 36-40.

dismissal of Leach's complaint under Federal Rule of Civil Procedure 12(b)(6).[55]
The Court denied this motion on December 1, 2020.[56]  Defendants now move for
summary judgment on Leach's First Amendment retaliation claim.[57]  Defendants'
Rule 56 motion is fully briefed and ripe for disposition.

## II.    STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate
and dispose of factually unsupported claims or defenses."[58]  Summary judgment is
appropriate where "the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law."[59]  Material
facts are those "that could alter the outcome" of the litigation, and "disputes are
'genuine' if evidence exists from which a rational person could conclude that the
position of the person with the burden of proof on the disputed issue is correct."[60]

At the Rule 56 stage, the Court's function is not to "weigh the evidence and
determine the truth of the matter" but rather "to determine whether there is a
genuine issue for trial."[61]  The Court must view the facts and evidence presented
"in the light most favorable to the non-moving party" and must "draw all

---

[55] Doc. 13.

[56] Doc. 19.  The Court only addressed Leach's First Amendment claim in this decision because
it was the only claim challenged by Defendants.  *See generally* Doc. 14.

[57] Doc. 25.  Defendants once again do not discuss Leach's due process allegations.

[58] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

[59] Fed. R. Civ. P. 56(a).

[60] *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (*quoting Clark v. Modern
Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

[61] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

reasonable inferences in that party's favor."[62]  This evidence, however, must be adequate—as a matter of law—to sustain a judgment in favor of the nonmoving party on the claim or claims at issue.[63]  A "scintilla of evidence" supporting the nonmovant's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]."[64]  Succinctly stated, summary judgment is "put up or shut up time" for the nonmoving party.[65]

## III.  DISCUSSION

Defendants move for summary judgment, contending that Leach failed to exhaust his administrative remedies and that his First Amendment retaliation claim fails on the merits.  We take Defendants' arguments in turn.

### A.  Administrative Exhaustion

The Prison Litigation Reform Act of 1995 (PLRA)[66] requires prisoners to exhaust available administrative remedies before suing prison officials for alleged constitutional violations.[67]  Proper exhaustion is mandatory, even if the inmate is seeking relief—like monetary damages—that cannot be granted by the

---

[62]  *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).

[63]  *Liberty Lobby*, 477 U.S. at 250-57; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986).

[64]  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alteration in original).

[65]  *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (quoting *Berkeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).

[66]  42 U.S.C. § 1997e *et seq*.

[67]  *See* 42 U.S.C. § 1997e(a); *Ross v. Blake*, 578 U.S. 632, 639, 642 (2016) (explaining that only "available" remedies must be exhausted).

administrative system.[68]  The exhaustion process a prisoner must follow is governed by the contours of the prison grievance system in effect where the inmate is incarcerated.[69]

Pennsylvania's Department of Corrections (DOC) employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases.[70]  If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based."[71]  An adverse decision by the grievance coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection.[72]  Finally, the decision of the Facility Manager may be appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals (SOIGA), and again must be submitted within 15 working days of the date of the Facility Manager's decision.[73]

The DOC has specific requirements for grievances submitted by inmates. Those requirements include, among other things, that the grievance "be legible

---

[68]   *Woodford v. Ngo*, 548 U.S. 81, 85 (2006).

[69]   *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Woodford*, 548 U.S. at 90-91.

[70]   *See Booth v. Churner*, 206 F.3d 289, 292 n.2 (3d Cir. 2002); COMMONWEALTH OF PA., DEP'T OF CORR., INMATE GRIEVANCE SYS., Policy No. DC-ADM 804 (May 1, 2015) (hereinafter "DC-ADM 804").

[71]   DC-ADM 804 § 1(A)(3)-(5).

[72]   *Id.* § 2(A)(1).

[73]   *Id.* § 2(B)(1).

[and] understandable"; "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance include "the specific relief sought," including "compensation or other legal relief normally available from a court."[74]

Leach filed two grievances regarding his Dietary job and request to be permitted to pray during work.  However, the first grievance—number 829861—does not raise claims of retaliation.  This makes sense because, according to the instant lawsuit, the alleged retaliatory actions were taken in response to this initial grievance.  Consequently, the only grievance substantively at issue for Leach's First Amendment retaliation claim is grievance number 854220.

In grievance 854220, Leach asserts that he was retaliated against by Kelley, Daya, Inch-Diorio, and Davis by being removed from his Dietary work assignment and being reassigned to Maintenance with lesser pay due to less work hours. Leach does not raise the DC-141 disciplinary report in this grievance, nor does he mention it on appeal.  Leach has, therefore, procedurally defaulted on the claim that he was retaliated against by Daya's filing of a false misconduct report against him.[75]  Although Leach did raise this retaliation claim during his appeal of

---

[74]  *Id.* § 1(A)(11).
[75]  *See Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004) (holding that PLRA exhaustion requirement includes a procedural default component).

grievance 829861, the claim was summarily dismissed—as opposed to being addressed on the merits—because Leach had failed to comply with DOC grievance procedure that requires any appellate issue to be raised in the initial grievance filing.[76]  Leach has not identified a basis to excuse his procedural default, so this retaliation claim cannot withstand Defendants' summary judgment challenge.

Defendants also contend that Leach defaulted on his retaliation claim against Biscoe because he did not name her in any of his grievances.  Leach counters that Defendants misapprehend the scope of his claims against Biscoe and that their Rule 56 exhaustion argument (limited to his retaliation claim) fails because he is also asserting a due process claim against her.  He further contends that no administrative remedies were available to grieve his due process claim.  According to Leach, DC-ADM 804 requires that grievances related to inmate discipline and misconducts must be addressed through DC-ADM 801.[77]  DC-ADM 801, in turn, provides that informal resolutions may be appealed "only in those cases where the inmate believes that the sanction is disproportionate to the offense."[78]  Thus, Leach argues, he could not appeal, grieve, or otherwise exhaust Biscoe's "No Action" determination on the informal resolution because DC-ADM 801 does not provide

---

[76]  *Compare* Doc. 27-1 at 2-6, *with Rinaldi v. United States*, 904 F.3d 257, 270-72 (3d Cir. 2018) (finding prisoner's claim, which had been raised for the first time on appeal of a different grievance, fully exhausted because it had been denied "on the merits" at the highest level).

[77]  Doc. 32 at 6.

[78]  *Id.* (quoting DC-ADM 801 § 2(C)(2)).

any avenue to do so.

The Court need not determine whether Leach availed himself of all available administrative remedies. That is because his Fourteenth Amendment procedural due process claim is fundamentally flawed.

To establish a Section 1983 claim for deprivation of procedural due process rights, a plaintiff must show that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'"[79] In the prison context, "state-created liberty interests" only arise "when a prison's action impose[s] an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"[80]

Leach has not identified an individual liberty or property interest that was infringed by the informal resolution process he alleges was procedurally deficient. In other words, Leach has not pled or proffered evidence that he suffered a deprivation of an individual interest protected by the Fourteenth Amendment. As the informal resolution form itself states, "No Action" was taken in response to the disciplinary charge. If no disciplinary action was taken, Leach could not have

---

[79] *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

[80] *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000) (quoting *Sandin v. Conner*, 515 U.S. 472, 483 (1995)).

suffered an "atypical and significant hardship."[81]  Consequently, Leach's

procedural due process claim is fatally flawed and must be dismissed because he

has not plausibly pled the first element of his claim.[82]  Dismissal will be with

prejudice, as Leach cannot cure the deficiencies inherent in this claim due to the

"No Action" outcome of the informal resolution.

In sum, Leach's prison grievances establish that the only retaliation claim he

fully exhausted involves his reassignment from Dietary to Maintenance and names

Kelley, Daya, Inch-Diorio, and Davis—not Biscoe.  Moreover, any Fourteenth

Amendment procedural due process claim against Biscoe fails because Leach has

not identified (in his pleadings or otherwise) deprivation of an individual interest

protected by the Fourteenth Amendment.  I therefore turn to Defendants' merits

challenge to the remaining retaliation claim.

## B.    First Amendment Retaliation

Although a prisoner's constitutional rights are necessarily circumscribed, an

inmate still retains First Amendment protections when they are "not inconsistent"

with prisoner status or with the "legitimate penological objectives of the

---

[81]   Leach maintains that misconducts resolved via informal resolution "are reflected on applicable block and work reports.  Due process requires dismissal and exoneration."  Doc. 32 at 6.  Leach does not explain how such reporting would implicate a liberty interest contemplated by the Fourteenth Amendment.  Furthermore, Leach does not explain why—if he desired to plead not guilty and to challenge the validity of the disciplinary charge—he did not seek a formal resolution with a Hearing Examiner, an option available to him.  *See* DC-ADM 801 § 2(C)(3).

[82]   *See* 28 U.S.C. § 1915(e)(2)(B)(ii) (explaining that the Court "shall dismiss"—at "any time" during the litigation—a claim that it determines "fails to state a claim on which relief may be granted").

corrections system."[83]  To establish a First Amendment retaliation claim, a prisoner must show that (1) "he was engaged in constitutionally protected conduct," (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the inmate's protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action.[84]

Defendants do not dispute that filing a prison grievance is protected conduct. They instead challenge the second and third elements of Leach's retaliation claim: adverse action and causation.

It is debatable whether Leach has established an "adverse action" for his retaliation claim.  Being assigned to a different job, after explicitly requesting reassignment, at the same rate of pay but working one less hour a day may not rise above *de minimis* action, *i.e.*, action that is insufficient to deter a person of ordinary firmness from exercising his First Amendment rights.[85]  Assuming, however, that such reassignment qualifies as an adverse action, Leach still cannot establish causation.

---

[83]   *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)).
[84]   *Id.* (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)); *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (quoting *Rauser*, 241 F.3d at 333).
[85]   *See Mitchell*, 318 F.3d at 530.

There are a variety of ways to prove causation for a First Amendment retaliation claim. One method is to show "unusually suggestive" timing between the protected conduct and the adverse action.[86] When a plaintiff relies solely on circumstantial evidence of temporal proximity, the time between the protected conduct and the adverse action is often measured in days rather than weeks or months.[87] However, there is no "bright line rule limiting the length of time that may pass between a plaintiff's protected speech and an actionable retaliatory act by a defendant."[88] Another approach is to demonstrate "a pattern of antagonism coupled with timing."[89] Finally, causation can be inferred "from the evidence gleaned from the record as a whole."[90]

Temporal proximity—with or without antagonistic conduct—is of no help to Leach. He filed grievance 829861 in October 2019 and his job reassignment did not occur until February 2020, four months later. There is, quite simply, nothing unusually suggestive about this timing, especially because Leach expressly requested the transfer. Leach therefore must establish causation from the totality of the record evidence.[91] The problem for Leach is that there is scant evidence of

---

[86]  *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

[87]  *See Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018).

[88]  *Id.*

[89]  *DeFlaminis*, 480 F.3d at 267.

[90]  *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

[91]  *See id.*

retaliatory animus by any of the remaining defendants.

The record reflects that on September 24, 2019—the same day Davis refused to allow Leach to pray while working—Leach requested a transfer to a different job assignment.  That reassignment took place approximately 5 months after Leach's request and 4 months after he filed his first grievance.  According to Bartholomew, this delay was the result of a long waitlist for an open Maintenance position.  The record also shows that Leach was informed on multiple occasions that DOC policy regarding religious accommodations had changed in December 2019 and a new process was implemented whereby prisoners had to first submit a formal accommodation request to local officials.

Leach acknowledges awareness of the policy change.[92]  Yet there is no evidence he ever made a formal religious accommodation request under the new DOC procedures.

Leach avers that Kelley made the decision to remove him from Dietary and reassign him to Electrical Maintenance.[93]  He does not explain how Daya, Inch-Diorio, or Davis were involved in his reassignment or played a role in this alleged adverse action.  Leach also does not advance any argument or explanation as to why Daya, Inch-Diorio, or Davis would retaliate against him for filing a grievance

---

[92]  *See* Doc. 32-2 ¶ 19.

[93]  Doc. 32-2 ¶ 20.  The record evidence, however, demonstrates that Bartholomew—the Corrections Employment and Vocational Coordinator at SCI Coal Township—was the actual decisionmaker.  *See* Doc. 27-11 ¶¶ 1, 2, 6-12.

that, as Leach himself argued on appeal to the Facility Manager, was directed solely at Kelley.[94]  Finally, Leach has not substantiated his claim that Kelley's actions (assuming Kelley made the decision to reassign Leach) were motivated by retaliatory animus.  Simply claiming that because Leach filed a grievance against Kelley and then four months later Kelley reassigned him to a slightly less favorable job does not establish that those two things are causally connected.

The only circumstantial evidence Leach has proffered regarding retaliatory animus is Daya's allegedly false misconduct report and statement that "since [Leach] like[s] to file grievances, [he] ha[s] to take the misconduct report up with" his Unit Manager.[95]  This evidence, however, only tends to infer that the DC-141 disciplinary report was motivated by retaliatory animus.  And, as discussed above, Leach procedurally defaulted on this retaliation claim.

The remainder of the record is devoid of evidence showing that retaliation was a substantial or motivating factor in Leach's reassignment.  Moreover, Leach does not address retaliatory animus for the job transfer in his Rule 56 briefing; he only argues that he has presented "sufficient facts to establish a connection between the grievance and the misconduct" to prove a retaliatory motive.[96] Without evidence of causation for the adverse action, Leach cannot meet his

---

[94]  *See* Doc. 27-1 at 4, 8.
[95]  Doc. 32-2 ¶¶ 10-11.
[96]  Doc. 32 at 4-5.

burden to show that a jury reasonably could find in his favor on his First Amendment retaliation claim.[97]  Therefore, the Court must grant summary judgment in Defendants' favor.

## IV.   CONCLUSION

Based on the foregoing, the Court will grant Defendants' motion (Doc. 25) for summary judgment on Leach's First Amendment retaliation claim.  The Court will also dismiss with prejudice Leach's Fourteenth Amendment due process claim.  An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[97]  *See Daniels*, 776 F.3d at 192 (quoting *Liberty Lobby*, 477 U.S. at 252).